Good morning, your honors. May it please the court, my name is Bernie Bays. I represent SHACA, which is a Maui community group with over 500 members and several of its individual members. My clients are intervenors as a matter of right in the federal action and they are the plaintiffs in the state action that was removed to federal court. As you know, in this case the district court struck down a Maui ordinance that was passed by the Maui voters in a general election through the initiative process. The ordinance was passed to address serious health, environmental, and economic concerns arising out of the extensive genetic engineered crop industry within the county of Maui. Basically, the GE crop industry had grown out of control on Maui and there was no end in sight. I would like to point out that this ordinance is the only ordinance that has been passed by initiative since the initiative process was added to the county charter in 1983, over 30 years ago. I think this underscores the importance of this ordinance to the people of Maui that I represent. I believe that this ordinance is the only broad police power that has been delegated by the state to the county of Maui. And I paraphrase, to enact ordinances deemed necessary to protect the health, life, and property of its citizens, which is exactly what this ordinance does. This also means that this ordinance was enacted for legitimate public purposes and that this ordinance was enacted for achieving those purposes. Are you going to be speaking on federal preemption? Yes, I'm going to be forced to handle both state preemption and federal preemption. I wanted to ask you a question on, in this case, the procedural posture is a little different than the other case in the sense that Judge Mulway, my understanding is, found both express federal preemption and implied federal preemption, correct? That's correct, Your Honor. Can you tell me the difference in the implications of those holdings? Well, I think there is no implied federal preemption where there's an express preemption provision in the Plant Protection Act. As you know, she struck down this otherwise valid statute on two grounds, state law preemption and federal preemption under the Plant Protection Act has a specific express preemption provision in Section 436. Well, I guess what I'm asking you, say, for example, if this panel were to hold that only express federal preemption applies, would the ordinance be facially invalid or only invalid as applied as to plants that are regulated under the PPA and have not been deregulated? Well, I think there's only the express preemption applies. There is no implied preemption. Well, but she said implied does. So I'm trying to ferret out how that differs in the actual application of things. She said that, and that was wrong. And I think we just looked at the... Let's just assume she's right. Just forget the procedural. Okay. Okay. What would that mean if she is, that there is federal express preemption and implied federal preemption? How would that play out? Well, I think what that would do, and basically what the FLEs ask the court to do in this case with regard to federal preemption, is to overrule this court's decision in Vilsack. As you know, the court in Vilsack carefully and narrowly defined the scope of the Plant Protection Act to regulating plant pests in order to avoid harm or injury to other plants. This ordinance does not do that. This ordinance is a land use ordinance operating only within Maui County. And its objective is not to control plant pest harms, but to control public safety, environmental, and economic risks that result not from a plant pest, but from the farming activities and practices that are being engaged in. So there's no effort by the county to regulate a plant pest. And if you would like, and I could take a minute, I could run through some of the harms that are addressed by this ordinance. And as I do that, you'll see that none of them are plant pest harms that fall within the scope of the Plant Protection Act, as defined by this court in the Vilsack case. Would that be helpful, Your Honors? Well, I think we understand the harms you've alleged, but it's your time for oral argument. So if you want to take us through that, fine. The difference in this case and the other cases is that we have an applied preemption holding. And so that would be most helpful if you could address that, because I think we understand the express preemption and the state arguments. Our position on – well, our position is simple on federal preemption, Your Honor. Well, but implied federal preemption would reach more things, wouldn't it? I mean, it would really – Well, it's our position, Your Honor, that this is very simple. And the recent case decided by the Supreme Court said that. Where there's an express preemption provision in the law, that's the definitive expression of congressional intent as to the scope of preemption. There's no need to look beyond the express preemption provision. And the express preemption provision in the Plant Protection Act defined the scope of preemption even more narrowly than the court in Vilsack defined the scope of the Plant Protection Act. Well, I guess – okay, if we do an express preemption analysis, with respect to the express federal preemption issue, do you agree that the ordinance seeks to control plants that are regulated by APHIS as plant pets under the Plant Protection Act? No, it makes no effort to do that. All this ordinance does is regulate farming operations and practices within the county of Maui and the public health, environmental, and economic issues that those create. It does nothing to regulate plant pets. That's the responsibility of the U.S. Department of Agriculture and APHIS. And as was pointed out earlier, the U.S. Department of Agriculture in its brief in the Vilsack case specifically said that the regulation of these kinds of public health, environmental, and economic concerns were beyond the scope of its authority under the Plant Protection Act. And it specifically said that those kinds of harms should be regulated by the states and local governments. And we agree with the U.S. Department of Agriculture on that point. You would like for us to – did you say overturn Vilsack? Is that what you said? No, that's what the appellees are asking to do, is overturn Vilsack. I agree with Vilsack completely. I think the analysis by the court in that case was exactly correct as to the limited scope of the Plant Protection Act. And what they held there is that the Plant Protection Act addressed only plant pest harms to prevent injury or damage to other plants. That's the scope of the Plant Protection Act. And the court specifically said in Vilsack that these kind of public safety and environmental harms are beyond the scope of regulation under the Plant Protection Act. Specifically, they discussed transgenic contamination, which is one of the harms that we seek to avoid with this ordinance. They also said increased herbicide use was not a plant pest harm and should be regulated by local government. They also pointed to the development of super weeds as another harm that was not a plant pest harm. And the court there said that those were beyond the scope of the Plant Protection Act. And the express preemption provision in Section 436 even more narrowly defines the scope of preemption in this case. And I would be happy to take a look at those with you if that would be helpful to the court. Well now, okay, but I think you're saying that Vilsack just controls this. But when I look at Vilsack, and of course I'm sitting next to someone that I think had something to do with it, it expressly did not address the noxious weed risk under the PPA. It was confined to plant pests other than noxious weeds. So it would follow that the PPA, as interpreted by Vilsack, does not necessarily seek to address different types of harms than the bans at issue. So I'm not sure that this can't be harmonized with Vilsack, but I'm not sure that Vilsack, I don't know that I read it the same that you do. Well, Vilsack did discuss the words noxious weed, which appear in the express, the first element of the express preemption provision in the Plant Protection Act. And what the court in Vilsack concluded was that the U.S. Department of Agriculture had never designated a genetically engineered crop as a noxious weed and that they designate specific plants as noxious weeds. Okay, but the issue presented in Vilsack was different whether APHIS erred by refusing to consider transgenic contamination and deciding to deregulate Roundup Ready alfalfa as a plant pest, right? Isn't that what the issue was? Yes, they had deregulated it as a plant pest. And they discussed the scope of the Plant Protection Act in doing that. And again, with respect to noxious weeds, they concluded that the U.S. Department of Agriculture and APHIS had never designated genetically engineered plants as a plant pest and had not regulated them under the Part 360 regulations, which deal with noxious weeds. But they had instead dealt with them only as a plant pest within the Part 340 regulations. So the court in Vilsack basically said that noxious weeds were irrelevant for our purposes here today. We're down to about two minutes. Do you want to reserve? I'd reserve those for rebuttal. Thank you, Your Honor. One more time, Your Honors. Good to work out today. It is a pleasure, truly. I'm going to be addressing the federal preemption express and implied, at which point I'll be splitting the argument with Ms. Braunster, who will be discussing the standing issues in the case as well as some wrap-up on state law preemption. In terms of federal preemption, I'd like to start with one thing because I think it's been a bit confused today. Vilsack had nothing to do with crops that were still under regulation by the agency. It had to do with deregulated crops. And so any statements that were made in that case about what APHIS's authority was or wasn't to prevent harms or alleged harms such as cross-pollination wasn't at issue. It's very clear from the regulations themselves. Again, if you look at Part 340.3 and Part 340.4, it's filled with requirements for the notification process and for the permit process that crops not be grown close together, that there not be inadvertent mixing and all of that. All of that is going to the alleged cross-pollination issues. In fact, we cited in our brief at page 42 and at note 8 a fact statement put out by APHIS where APHIS discusses, among other things, how it does its field tests. And what it says is that it oversees field tests of GE plants through its notification and permit processes to ensure GE organisms and their progeny do not escape or persist in the environment. Companies must submit all plans for field testing for review. The program only approves those applicants with the ability to adequately confine regulated articles within field test sites, et cetera. The whole program is to prevent the dissemination of these plant pests until or unless it's decided they're not. So of course they've got that authority to prevent that harm, and of course they address it. In fact, permits tend to be hundreds of pages long with stock full of isolation distances and the like. In terms of the express preemption for a moment, counsel, with due respect, was sort of mixing up Supreme Court precedents. When he said that if there is express preemption provision, you can't have implied preemption, he was referring to the Supreme Court's holding in Cipollone. That was a long time ago. That aspect of Cipollone has been overruled by, among others, Geyer, Freightliner, and Spritzma. These cases are discussed at page 34, note 12 of our brief. It's quite clear under current law that regardless of whether there's an express preemption clause, you can go on and look whether there is implied preemption as well. That's what I want to know in terms of what more do you get out of an implied preemption finding. Thank you, Your Honor. There's two aspects to it. Number one, as to regulated crops, the ones that are still under regulation, it is an argument that doesn't give us more, but even if this Court were to disagree with express preemption, implied preemption would cover those crops under regulation. And I think that argument is actually very straightforward and very compelling. When you say regulated crops, what are you? What I'm talking about at this point are GE crops that are being grown pursuant to permits or under the notification procedure of APHIS. So it still considers them to be plant pests. It's still regulating them as plant pests. The companies are field testing them, et cetera. If they deregulate it, then implied can? Then implied would be a broader remedy, exactly. If implied preemption applies to deregulated crops, it's a much broader remedy for us against this ordinance. In other words, the ordinance would be knocked out in its entirety. As to regulated first, the reason why you've got very evident conflict or obstacle preemption is the agency wouldn't be able to conduct its program under the methods that it's chosen to do so if states and localities could simply say no field tests. I mean, the agency comes in and says, yes, you may have a field test. That's both to advance the interests of agriculture, but also very clearly so the agency can use the results of that field test to determine whether it has continuing jurisdiction over that plant. Well, in this case, though, doesn't the existence of express preemption clause defeat your obstacle preemption agreement? Not at all. Argument, rather? It just complements it, Your Honor. In other words, the fact that there's an express preemption clause we think covers all of that turf already. But if this Court were to disagree, you'd still have obstacle preemption. And as I've noted, the Supreme Court has held now time and again that the presence of an express preemption clause doesn't affect how you look at implied preemption. I think you look at some Federal Register statements that you quote in your brief in support of your obstacle preemption argument. Are they consistent with the scope of the express preemption clause? I think they are, Your Honor.  Well, I was going to say, Your Honor, you put your finger on it, they are at least as broad as the argument, as the express preemption clause would go. Because what they hold essentially is when APHIS has crops that it is dealing with under its regulations, states can't add to or have different from regulations of these same crops. And so that certainly covers the turf that's covered by the express preemption clause. We think it goes further. We do believe that implied preemption covers deregulated crops as well. But, you know, agriculture has always been the subject matter of states and counties and all of that. Give me some examples of other areas where you have this implied Federal preemption. Is it like banks? Where is it this broad? I mean, give me some other. Well, let me put it this way. You're asking for something really broad here. Your Honor, I'm not talking about field preemption, just to be clear here. You know, we're still in the realm of conflict preemption, and so it is my duty and my burden to be able to explain what interests of the Federal Government are being frustrated in order to justify implied preemption of deregulated. I've already explained why regulated, why state regulation of regulated crops would frustrate those programs. As to deregulated, and I think that's awfully compelling, as to deregulated crops, the answer is that you've got a statute here that quite expressly in 7701, Congress's findings are that the smooth movement of enterable plants through the United States is critical to the U.S. economy and should be facilitated to the extent practicable. What the agency has done, and that provision also, 7701, also provides that the regulations have to be done on the basis of sound science. The agency has taken these instructions from Congress and acting within its authority under Congress, has established a scheme, a science-based scheme, where it determines over a multi-year period, subject to rigorous analysis, whether these GE plants have harms that are different from the conventional plants from which they originated. If they don't have harms that are greater than that, they are deregulated, they're determined not to be plant pests. What the county is doing here, at least in part, is coming in and saying, we don't buy it. We don't trust what the federal government has done. We want a redo. I mean, obviously, it's just a flat ban, but even to propose a modification of that ban, you've got to do what they call an EFIS, which is like an EIS or an EA, incredibly in-depth, and you've got to redo the analysis that EFIS already did, again, at least in part. And if you look, for example, at the ordinance of Section 7.3.F, they talk about horizontal gene transfer from GE organisms between organisms of different species may occur. That's one of the things that they say that has now got to be done under the county's EFIS. Well, that is... Just what I'm thinking is maybe it doesn't make much of a difference here, but in a published opinion in nine states on the Ninth Circuit, it could make a big difference if implied preemption is found. In terms of its precedential value? Yes. There's no doubt. We don't think that we're acting outside of precedent in this case, so we don't think that this court would be taking an additional step. What other cases has both expressed and implied preemption? Well, again, the cases that I cited before from the Supreme Court, where you've got Freightliner, Spritzma, and Guyer, are all cases where there were expressed preemption clauses and the court went on to consider implied preemption as well and referred back to its statement in Cipollone that you couldn't have both and said that that's wrong. And the reason, actually, when you're talking at least about conflict preemption, makes a lot of sense. Congress can't foresee everything that a state or a county might do that could frustrate the federal plan or what the agency is seeking to accomplish, particularly when it comes to agencies. And you talk about Congress because there is a presumption that whatever is beyond the scope of the expressed preemption provision was not intended to be preempted by Congress. No, I don't think there is, Your Honor. I don't think that that presumption has outlived the cases that I've cited. But in any event, what we're talking about here, of course, is preemption by what the agency is doing. And we have to look there to the City of New York v. FCC case, the Supreme Court case. At that point, you're not looking at congressional intent to preempt anything in particular. What you're looking at there is the county, in this case, acting within its lawful authority and promulgating its regulations. That's the first question. The second question, then, is, is what the, no, sorry, not the county, is what APHIS is doing something that it has lawful authority to do? That's the first question. Here, it does. There's no dispute about that. The second question, then, is, is what the state or county is doing going to frustrate the accomplishment of what that agency is doing? Now, that's not something that Congress, you know, often will foresee because it doesn't always foresee everything that an agency is going to do under its lawful authority to promote the programs. So you have to look at conflict preemption as well as express preemption, and certainly states and counties aren't allowed to frustrate what federal agencies are trying to accomplish within their lawful authority. Again, that's City of New York v. FCC. So you're saying there's express preemption and then implied conflict preemption. Yes. But not a field. Bingo. That's exactly it, Your Honor. That's our position. I'd like to reserve, if I could, the remainder of my time to Ms. Braunstreich. See, I've taken some of hers. And I apologize for that. Thank you. Thank you. Well, now I get to say good afternoon. Yes, indeed. We've been at this so long. I want to touch upon a few things with respect to state preemption that I think were somewhat confused this morning, and that is the fact that the argument seems to be that if the legislature did not say that the counties couldn't do it, they can. And that simply disregards the manner in which our state government is set up. Under the Dillon Rule, we have a situation where the counties are only allowed to do what has been specifically delegated to the counties. So it is not a situation where you're just sitting there and everyone can do everything as long as it's not prohibited. It's exactly the opposite. And so what you have to start with is where is the authority to regulate in the area of ag? And I believe that Article 11, Section 3 is critical to the beginning of the analysis as to whether or not there is a comprehensive scheme. And I think both Judge Curran and Judge Mulway got it right in this regard. Judge Curran said that the idea that there may be police powers or the public trust obligations does not get around the fact that the state has a comprehensive regulatory scheme for regulating pesticides and GE crops, which together with the context of the statewide constitutional concern for ag and the administrative structures in the Department of Ag and the Department of Health, evidences intent that state law be uniform and exclusive. The Constitution said the state shall conserve and protect agricultural lands, promote diversified ag, and the Constitutional Convention showed that diversified ag included GE, increase agricultural self-sufficiency, and assure the availability of agriculturally suitable lands. So we start with that proposition, and then it says the legislature shall provide standards and criteria to accomplish the foregoing. And when the legislature set up the very elaborate schemes, it was consistent with how the state operates. Hawaii is an incredibly centralized government. We have no townships. We have no towns. We have the state government, which covers everything, and we've got four counties. And historically, we have not delegated tremendous regulatory authority to the counties. I mean, we have a statewide school system from kindergarten all the way up through college. Our community colleges are statewide, run by the state. The Department of Health, our hospitals, everything is centralized. So when we talk about having the Department of Ag have these people come in from the counties, it is to advise the state as to how the state is going to regulate, not as a way of delegation. Judge Callahan, you asked earlier about the question of whether or not 194, which had a role for the counties, was a delegation. Right. I do have a question. How can we hold that state law impliedly preempts counties from banning GE crops when the state law, including, I think, Section 141.3 and 194.2, clearly recognize that counties may control plant paths? Well, I think what it says is that they can come in and work with the state. The way the system works is the Department of Ag calls upon people from all over, the Department of Tropical Ag, the university, county players, and brings them in and says, let's figure out what we should be doing on a statewide basis. And then 141 specifically says, and then the Department of Ag should go to the legislature to see whether there are additional things. But it is a centralized aspect. It is not a statute that says, okay, counties, you go regulate. That's not what 194 does, 141.3 does. It deals with the centralized aspect. Well, it seems, though, I mean, I think that when we were discussing, is your case more like Ewing or more like Citizens Utilities Company or whatever? It seems like maybe it's more like Ewing. Well, I think the reason that it's distinguishable from Ewing is that in this case, the counties are simply relying on broad police powers. And those broad police powers are, within the statute itself, restricted not once but twice. Their police powers say, subject to the general laws. So if the state has general laws and the Department of Ag, I think that's already a limitation. And then the police power says also they cannot regulate where there is a comprehensive scheme or conflict. Well, give me a practical application of how it plays out for you if the court were to hold. There is expressed federal preemption. There's not implied federal preemption. And that there's not implied state preemption. How does that play out for you? Well, I mean, if the court were to rule that way, you would be changing fundamentally the way that the state government has operated throughout its history. You'd basically be giving counties rights to regulate in areas that they've never been regulatory bodies. If you look, for example, at the veto message in Kauai, the mayor said, this isn't our thing. If you look at the county here, the county has not even appealed the ruling. And we'll get to that in a moment if I have time. But I think that it would fundamentally change things and give counties areas of regulation that simply have never existed. Well, what about, though, is there, let me, I'm always looking for easy ways every time we talk about preemption. But what about the county ordinance penalty provision that violates the charter? If that's in violation of the charter, does the panel even need to address preemption? Well, actually, we believe that there are multiple areas in which the ordinance violated the charter. Not only the penalty provision, but. But I'm just asking you specifically. If the panel were to find that the penalty provision violates the county charter, if does the panel need to address the preemption issue? As long as the panel found that there was no ability to sever. And if the court. That's my question. So is there an ability to sever? I don't believe there is an ability to sever. And as I mentioned, so if the court believed that it violated the charter and was not severable, that could be the end of the story. And we don't need to reach anything else. But we believe that you cannot sever because it was part. The penalty provision was part and parcel of the entire ordinance. And as Judge Mulway said, you may be able to look at part of the severance, but the civil penalties is another problem that you have. And then in addition, there are other charter problems that this ordinance had. Including that the initiative attempted to place a limit on the role of the county council. And whether or not, how long it would take for the county council to be able to modify or repeal the statute. So there are many problems. And we think that without looking at all of them, you could never sever and try and slice and dice it. Because you'd be stepping in and trying to rewrite the entire law. And that is not allowed. So you can get rid of the Maui ordinance with respect to the county charter issues. There are county charter issues also in Kauai, which the court never reached. But we believe that if you could also eliminate the entire law by looking at the state preemption issues. What I wanted to also raise was our motion to dismiss. And I know I have very limited time here. But we believe that the SHACA should not be able to proceed because they came in here as proponents to law. Hollingsworth made clear that as proponents they did not have standing. And we believe that they are more like the plaintiff in Diamond. Where they're attempting to pursue the appeal simply to force the government to pass a certain type of law. And we don't believe that they have that right. And finally, under the Lujan test, they have not asserted an injury in fact. Instead, their injury is general to the population at large. Or it is purely conjectural and hypothetical. GE plants and the parties here have been together for decades in Maui. And yet they have not asserted any specific injury or established any specific injury that would be redressed by allowing this ordinance to go into effect. For example, a lot of what they're saying is that they are troubled by pesticides. The Maui ordinance is not a pesticide ordinance. So we believe that their ability to show standing when the county has chosen not to appeal is something that they cannot meet. And actually this court could strike down or just simply dismiss this appeal and not reach the merits that we've spent so much time talking about. Judge Callahan had a question. The thing that if once a GE crop is created with a plant pest, once it's been deregulated by APHIS, it's just like any other crop then, right? Then it is treated as presumptively another crop. As far as the PPA is concerned? Yes. Okay. So based on your argument of the state preemption, then they wouldn't be able to ban these, if it was deregulated, then they still couldn't ban them. Is that right? That's correct. If the court adopts the federal conflict, implied conflict preemption, the state could not do it. But if either the court does not agree or you look at other aspects of regulation that wouldn't potentially be conflicted, then our position is that it's the state that has the exclusive jurisdiction. Okay. Thank you, counsel.  Thank you, Your Honor. I'm going to start out by agreeing with a statement that was made by counsel. He said that the whole purpose of the Plant Protection Act is to prevent dissemination of a plant pest. I agree with that. It's the responsibility of APHIS in issuing these permits to prevent the dissemination of a plant pest. That's APHIS's job. We assume they're doing a good job on that. Our job as the county of Maui is to regulate land uses within Maui County and to regulate the harms that can be caused by those land uses. That's exactly what this ordinance does. It does nothing to interfere with APHIS's responsibility to prevent, and I quote again, the dissemination of a plant pest. So that's the limitation of the authority of APHIS, according to this court in Vilsack. So that's its job. Our job is to regulate the farming practices and farming operations within Maui County. And historically, the regulations of those kinds of practices have been done in Hawaii at the county level, subject to general parameters established by the state. So historically, that's the way it's been done. To spend just a moment on the state preemption issue, which has already been pretty well beat to death here, what the state could do or might have done is not what's relevant here. What's relevant here is what the state has done. And the reality is that the Attorney General has said that there are no state statutes regulating genetically modified crop farming in Hawaii. And as a practical matter, what's happened is that the regulation of GE crops in Hawaii has been left to the counties. And this county-by-county approach to regulation of GE crops in Hawaii makes a great deal of sense, where the counties are separated from each other by big stretches of open ocean. So farming practices in Maui County are not going to have an effect in Honolulu County. Also, county-by-county regulation makes sense because each of the counties have different land use goals and objectives. So it makes sense in Hawaii to do what we have done, and that's that the state has not regulated genetically modified crops, according to the Attorney General. And I think we can expect that if there were the kind of statutory scheme that was intended to be comprehensive, uniform, and exclusive, that the Attorney General of the state of Hawaii would know about it. He said there are no such laws. And as you can see, laws have been introduced at the state level to regulate GE crops. None have been passed. The reality is that this has been done on a county-by-county basis. And I think in Hawaii, that's a sensible way to do it. The case I was referring to on express preemption versus implied preemption is the Franklin case. And in that case, the Supreme Court recently said that where there's an express preemption provision in the law, that defines congressional intent as to preemption. And what the court says was is Congress does not hide elephants in a mouse hole. In other words, if Congress has an intent with respect to preemption, it includes that in the express preemption provision. So we look to that exclusively to define the scope of preemption that was intended by Congress. Thank you. Thank you. Thank you all for your arguments this morning. It's very interesting and important cases. I want to thank the audience for their attention. And the case just argued will be submitted for decision. We'll be in recess for the morning. All rise.
judges: Thomas, Callahan, Murguia